1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   JOSE M. LOPEZ,                          No. 1:16-cv-01489-LJO-SKO HC

12                  Petitioner,

13          v.                               **FINDINGS AND RECOMMENDATIONS
                                             TO DENY PETITION FOR WRIT OF
14   DANIEL PARAMO, Warden, R.J.             HABEAS CORPUS AND DECLINE TO
     Donovan Correctional Facility,          ISSUE CERTIFICATE OF
15                                           APPEALABILITY**
                  Respondent.
16                                           **(Doc. 1)**

17

18

19          Petitioner, Jose M. Lopez, is a state prisoner proceeding *pro se* with a petition for writ of

20   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner alleges four grounds for habeas relief: (1)

21   insufficient evidence; (2) jury instruction error; (3) violation of the Double Jeopardy Clause; and

22   (4) violation of his Eighth Amendment rights.  The Court referred the matter to the Magistrate

23   Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304.  Having reviewed the record

24   as a whole and applicable law, the undersigned recommends that the Court deny the habeas petition.

25

26

27

28
                                             1

## I.    <u>Factual and Procedural Background[1]</u>

Petitioner lived with Kimberly McCants ("McCants") and her four children for five years. Petitioner is the father of the three youngest children, who were ages two through four at the time of trial. The fourth child was McCants' son from a previous relationship. The events at issue in this petition primarily unfolded between July 30 and August 1, 2012.

Petitioner did not allow McCants to look at or speak to other men. He accused her of sneaking out at night, so he barricaded the door by placing toys in front of it. Petitioner would tie McCants to the mattress at night with handcuffs he had from his prior job as a security guard. At times Petitioner would also make McCants lie flat on the bed and he would handcuff one of her hands to the side of the mattress and zip-tie the other hand to the other side of the mattress. Petitioner accused McCants of using her feet to get out of the ties, so he tied her feet together with a rope and then tied the rope to the hall closet so that she could not move her legs. Petitioner bound McCants so tightly that when she woke up in the morning, her wrists and ankles were always bleeding. She had open wounds that only healed after McCants was later hospitalized, but was left with permanent scarring on her wrists and ankles. Petitioner would become frustrated when he tied McCants down and would bite her, which left scarring. McCants had to wear long sleeves, even during the summer, so that no one would see the wounds on her arms.

Petitioner also hit McCants in the ear with his fists. The first time Petitioner's actions sent McCants to the hospital was after he stabbed her in the hand with a steak knife. McCants told the hospital staff that she had stabbed herself with the knife while reaching into the sink washing dishes.

On one occasions, Petitioner was hitting McCants in the head with a child's toy and when McCants tried to block the blows with her hand, Petitioner "took o[ff] the end of [her] pinky" finger.

---

[1] The factual background, taken from the opinion of the California Court of Appeal, Fifth Appellate District, *People v. Lopez*, (Cal. Ct. App. Sept. 22, 2015) (No. F068446), is presumed to be correct. 28 U.S.C. § 2254(e)(1).

McCants did not go to the hospital for a week and told the nurse she shut the van door on her finger.

McCants went to the hospital another time after Petitioner stabbed her right leg on the side of her upper thigh with a butcher knife during an argument. Petitioner would not let McCants go to the hospital for a couple of days until her wound began gushing blood after she coughed. McCants told hospital staff she fell on a piece of glass while at the river.

Petitioner hit McCants flat on her hand with the bat, which moved the knuckle of her ring finger "all the way to the back of [her left] hand." Petitioner would not let McCants get medical attention for that injury and she later required two hand surgeries.

Petitioner also used a hammer to beat McCants on a couple of occasions and hit her toes so hard that he split her toe open.

In June or July, Petitioner and McCants received an eviction notice on their rental property requiring them to leave by August 1, 2012. Petitioner blamed McCants for the eviction. He made her sit on the couch and hug a pillow so no one would hear her scream when he hit her on the back with an aluminum bat.

When asked if she felt free to leave her relationship with Petitioner, McCants replied, "Absolutely not." On July 30 or 31, 2012, Petitioner threated to kills McCants. Petitioner asked McCants if she wanted to die on the couch or in the bathtub. McCants begged Petitioner not to kill her, but Petitioner said it had gone too far and killing McCants was the only way he had out.

During this two day period, Petitioner hit McCants with the bat and split open her knee to the bone. Petitioner would not allow McCants to get medical attention for her knee because there was no logical explanation for her injuries. McCants' back was very sore and she was unable to move or walk. She was no longer able to control her bladder when Petitioner hit her with the bat. Petitioner sometimes laughed at McCants and other times yelled at her because he said she was urinating in her pants on purpose. Petitioner told McCants he would continue to hit her until she

3

did what she was supposed to do.

Petitioner ordered McCants to wash the dishes, but she was so weak she could not get off the floor. Petitioner kept hitting McCants on her shoulder with a baseball bat. When McCants begged Petitioner to stop, he replied that he would not stop until he knew he broke a bone. McCants heard "a bunch of cracking" in her shoulders.

On the evening of July 31, 2012, Petitioner hit McCants with a bat[2] so hard in the back of her ribs that she could hardly breathe and knocked the wind out of her. McCants could not breathe and believed that she was dying.

That evening, McCants remembered her oldest son bringing a baby mattress into the living room for her and lying down on the mattress trying to sleep. [3]

McCants had injuries on her body that were not present before she passed out. She suffered permanent scars and lumps between her breasts and toes from the beatings. She also had visible injuries to her forehead, chin, knee, legs, and ears. McCants identified other injuries she suffered to her right foot, ankles, and wrists from the bindings.

On August 1, 2012, Senior Deputy William Hakker ("Deputy Hakker") of the Kern County Sheriff's Department was dispatched to the apartment where McCants and Petitioner lived. Deputy Hakker found McCants lying unconscious on a mattress on the living room floor. She was extremely pale and nonresponsive. McCants was transported by ambulance to the hospital.

Dr. Peter Ellis ("Dr. Ellis") was the emergency room physician who attended to McCants when she was brought to the hospital. Dr. Ellis described McCants' condition as grave and did not expect her to survive. McCants was very pale, her blood pressure was extremely low, and her vital

---

[2] In the facts section of the opinion, the Court of Appeal stated Petitioner hit McCants in the back with a bat, knocking the wind out of her. However, through the rest of the opinion, the Court of Appeal notes that Petitioner hit McCants with a hammer, knocking the wind out of her.

[3] The next thing McCants remembered, she woke up a week later in the hospital.

4

signs were unstable. She had obvious signs of bleeding: her hemoglobin level was very low, she was unresponsive, nearly without any blood, and comatose. McCants was in danger of having her liver and kidneys go into shock and shutting down.

McCants had head injuries, including a large gash on her head. She had deep ligature marks on her wrists and ankles that extended into the dermis of her skin and were becoming gangrenous. McCants had multiple rib fractures and an extensive injury to her entire upper chest that included significant swelling. McCants had a pneumothorax injury, a rib fracture that damaged and partially deflated one of her lungs, which was the possible source of blood loss. She had significant swelling over her shoulders and fractures to two lower lumbar vertebrae.

Dr. Ellis testified that the massive swelling to her chest and shoulders was where McCants likely suffered blood loss. A large amount of blood was drained from McCants after a chest tube was inserted. This procedure caused so much more bleeding that McCants had to be transfused with more blood. Dr. Ellis concluded that McCants was one of the most traumatic cases he had seen in many years. Dr. Ellis had never seen a patient with injuries as extensive as McCants' live and walk out of the hospital.

McCants' oldest son was in second grade at the time of the trial. He testified he saw Petitioner tie his mother to the bed more than once and saw marks and other injuries to his mother's feet. He saw Petitioner use a gray metal bat on his mother more than once. Petitioner told the boy not to call an ambulance for his mother. On the evening before McCants went to the hospital, he saw her pass out.

Petitioner's aunt and cousin testified that they never saw any McCants with any injuries and never observed violence between the two. Petitioner's ex-girlfriend from 2000 testified that she had a good relationship with Petitioner, they never fought, and Petitioner was never aggressive or violent toward her.

Petitioner testified that McCants cut herself with knives, hated her life, and Petitioner had to hide knives from her. Petitioner said things got so bad that he had no choice but to restrain McCants. They had no money to get help for McCants, and Petitioner and McCants came up with the zip-tie idea together. McCants once tried to jump out of a moving vehicle after complaining that she hated her life.

Petitioner denied threatening to kill McCants and said he only asked her where she wanted to die because she kept cutting herself. Respondent admitted that he might have hit McCants with a baseball bat because things "escalated," but he denied hitting McCants with a hammer.

The evening of July 31, 2012, Petitioner said he had a heated argument with McCants and "things got a little out of hand." Petitioner said he grabbed McCants by the shoulders and shook her with his hands. Petitioner explained the old bruises on McCants' shoulders were not caused by him. When Petitioner woke up the next morning, McCants was unresponsive. He panicked as he tried to wake her up and slapped her face before calling 911.

Petitioner admitted hitting McCants with a bat, though he was unsure how many times he hit her with it. Petitioner acknowledged that things escalated, but he did not remember details from the evening of July 31, 2012. Petitioner said he did not notice something was wrong with McCants until he woke up on August 1, 2012. Petitioner did not tell investigators he beat McCants with a bat or that there was an altercation the night before because he was scared.

When investigators arrived at the apartment, there was blood on the mattress in the location where McCants' head was resting. Bloody bandages were found in the dumpster outside the apartment. Petitioner denied to officers that he ever hurt McCants and said that she hurt herself.

At the conclusion of a jury trial, Petitioner was convicted of counts 1-6: six counts of torture (Cal. Penal Code § 206); count 8: mayhem (Cal. Penal Code § 203); count 9: corporal injury (Cal. Penal Code § 273.5(a)); counts 10 & 11: assault with a deadly weapon (Cal. Penal Code § 245(a)(1);

and count 12: false imprisonment with violence (Cal. Penal Code § 236). The jury acquitted Petitioner of count 7, attempted murder, but found him guilty of the lesser included offense of attempted voluntary manslaughter (Cal. Penal Code §§ 664, 192(a)). The jury also found true the great bodily injury allegations alleged as to each count.

Petitioner was sentenced to a determinate sentence of 20 years and 10 months on the attempted voluntary manslaughter charge and counts 9 through 12. Petitioner was sentenced to a determinate sentence of 25 years on counts 1, and 3 through 6, for the great bodily injury enhancements and to consecutive indeterminate sentences of life with the possibility of parole. Sentences on counts 2 and 8 were stayed pursuant to California Penal Code § 654.[4]

The California Court of Appeal for the Fifth Appellate District affirmed the judgment on September 22, 2015. On December 14, 2015, the California Supreme Court summarily denied Petitioner's petition for review.

On October 5, 2016, Petitioner filed his petition for writ of habeas corpus before this Court. Respondent filed a response on January 3, 2017, and Petitioner filed a reply on April 6, 2017.

## II.    Standard of Review

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997). Under the statutory terms, the petition in this case is governed by AEDPA's

---

[4] California Penal Code § 645(a) provides:

An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other.

provisions because it was filed April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring). Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under AEDPA, a petitioner can obtain habeas corpus relief only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71. In doing so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The petitioner has the burden of establishing that the decision of the state

court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

### III.   The State Court Did Not Err in Denying Petitioner's Insufficient Evidence Claims

In his first ground for habeas relief, Petitioner alleges there was insufficient evidence to support the great bodily injury enhancement to count 11, felony assault. (Doc. 1 at 35.) Specifically, Petitioner contends that striking McCants on the back and knocking the wind out of her is not sufficient evidence to support a great bodily injury. *Id*. Respondent counters that the state court's application of constitutional law was reasonable. (Doc. 12 at 14.)

### A.   Standard of Review for Insufficient Evidence Claims

To determine whether the evidence supporting a conviction is so insufficient that it violates the constitutional guarantee of due process of law, a court evaluating a habeas petition must carefully review the record to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Windham v. Merkle*, 163 F.3d 1092, 1101 (9th Cir. 1998). It must consider the evidence in the light most favorable to the prosecution, assuming that the trier of fact weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in the manner that most

supports the verdict. *Jackson*, 443 U.S. at 319; *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997).

## B. State Court of Appeal Opinion

The Court of Appeal found substantial evidence established the great bodily injury enhancement on the felony assault claim, count 11. *People v. Lopez*, (Cal. Ct. App. Sept. 22, 2015) (No. F068446), at 9-11.

The Court of Appeal held:

The prosecutor argued to the jury that the hammer blow to the victim's shoulder causing her to lose her breath constituted great bodily injury as alleged in count 11. [Respondent] argues the victim's testimony [that] she had the wind knocked out of her from a hammer blow to her shoulder was factually insufficient to constitute great bodily injury. We reject [Respondent's] factual and legal assertions.

Great bodily injury is defined as significant or substantial physical injury as distinguished from injuries that are trivial or cause only moderate harm. ([Cal. Penal Code] § 12022.7, subd. (f); *People v. Cross* (2008) 45 Cal.4th 58, 63-64; *People v. Escobar* (1992) 3 Cal. 4th 740, 749-750.) Our Supreme Court has long held that determining whether a victim has suffered great bodily injury is a factual inquiry to be resolved by the jury, not a question of law for the court. There can be a fine line dividing a significant or substantial injury from one that does not meet the description. (*People v. Cross*, *supra*, at pp. 63-64; *People v. Escobar*, *supra*, at pp. 750-752.) Great bodily injury "is commonly established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury." (*Cross*, *supra*, at p. 66.)

A finding of great bodily injury will be sustained when there is "some physical pain or damage, such as lacerations, bruises, or abrasions." (*People v. Washington* (2012) 210 Cal.App.4th 1042, 1047.) For example, a great bodily injury finding was sustained where the victim suffered a severely swollen jaw, sore ribs for two weeks, cuts to the arms, and bruises to the head, neck, and back. (*People v. Mixon* (1990) 225 Cal.App.3d 1471, 1489.)

We consider the injury McCants suffered to her shoulder to be greater than the injuries suffered by the victims in the above cited authorities. [Respondent] hit McCants's shoulder with a hammer. This did more than knock the wind out of her, as [Respondent] now contends. When McCants was brought to the emergency room, she had massive swelling over her upper chest area and shoulder. Dr. Ellis testified such an extensive enlargement of McCants's chest and shoulder could have been a source of blood loss.
Dr. Ellis further testified McCants had a very low hemoglobin level, she was unresponsive, nearly without blood, and in a coma. The pH of McCants's blood

was low, indicating it was not circulating properly. McCants was in danger of her liver and kidneys going into shock and shutting down. The only reason Dr. Ellis did not think McCants was dead was because she was still breathing. Though some of McCants's blood loss was from external bleeding, she was also bleeding internally, including from her chest and shoulder injuries. McCants's blood loss from her shoulder injuries contributed to her loss of blood, necessitated blood transfusions, and nearly led to the loss of McCants's life.

Great bodily injury "is commonly established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury." (*People v. Cross*, *supra*, 45 Cal.4th at p. 66.) The injuries to McCants's shoulder caused massive swelling in addition to loss of breath. [Respondent's] assault with a hammer led, in part, to McCants's hospitalization. The fact the shoulder injury contributed to McCants's loss of blood, low hemoglobin, and low blood pH – which combined threatened the shut-down of her liver and kidneys as well as her death – places the facts of this case beyond the injuries that constituted great bodily injury as discussed in *Corona*, *Mixon*, and *Washington*. There was substantial evidence in the record to support the jury's finding McCants suffered great bodily injury as alleged in count 11.

*Id.*

### C. Denial of Petitioner's Insufficient Evidence Claim Was Not Objectively Unreasonable

Petitioner maintains that the evidence presented at trial was insufficient to prove that McCants suffered great bodily harm from the hammer blow to her shoulder. (Doc. 1 at 35-38.)

Petitioner presents the same argument before this Court as before the Court of Appeal; he is asking this Court to reweigh the evidence in his favor. However, on habeas review, this Court does not reweigh the evidence presented at trial. Instead, the Court must review the record to determine whether a rational trier of fact could have found Petitioner caused great bodily harm when he hit McCants on the back with a hammer.

Pursuant to count 11, Petitioner was charged with assault with a deadly weapon in violation of California Penal Code § 245(a)(1).[5] The prosecution alleged that in the commission of the assault, "and under circumstances involving domestic violence," Petitioner inflicted great bodily

---

[5] California Penal Code § 245(a)(1) holds: "[a]ny person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm shall be punished by imprisonment in the state prison . . . ."

injury on McCants "within the meaning of [California] Penal Code section 12022.7(e)."[6]  (Lodged Doc. 1 at 162-3.)

In California, great bodily injury is defined as "a significant or substantial injury."  Cal. Penal Code § 12022.7(f).  Great bodily injury is "distinguished from trivial or insignificant injury or moderate harm."  *People v. Cross*, 45 Cal. 4th 58, 64 (2008) (quoting *People v. Miller*, 18 Cal. 3d 873, 883 (1977)).

Here, McCants testified that Petitioner hit her in the back of her ribs and that he knocked the wind out of her.  (Lodged Doc. 4 at 74.)  Deputy Hakker testified that he saw "bruising on [McCants'] upper left shoulder area."  (Lodged Doc. 5 at 337-38.)  Dr. Ellis, the emergency room doctor, testified McCants "had extensive injury to her chest.  She had significant swelling over the entire upper chest area and shoulders when we saw her."  *Id*. at 389.  Dr. Ellis noted that they were concerned with her swollen chest "because that's a possible blood loss source.  You can lose four liters of blood into your chest.  [W]hen we saw the bruising and everything, massive enlargement of the chest and shoulders, that's possibly where some of the blood may have gone."  *Id*. at 389-90.  When they inserted a chest tube, doctors found "a substantial amount of blood in the chest," which caused her difficulty breathing.  *Id*. at 390.  Dr. Ellis stated that McCants did not have any blood left and "she was extremely weak and unresponsive . . . and her vital signs, blood pressure, heart rate, all were very unstable and she actually looked like – if I didn't see her breathing, I would have thought she was a dead person.  She was that ill."  *Id*. at 383-84.

Evidence is considered in the light most favorable to the prosecution, and it is assumed that the jury weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from

---

[6]  California Penal Code § 12022.7(e) holds: "[a]ny person who personally inflicts great bodily injury under circumstances involving domestic violence in the commission of a felony or attempted felony shall be punished by an additional consecutive term of imprisonment in the state prison . . . ."

the facts in a manner that supports the verdict. *Jackson*, 443 U.S. at 319. Based on the testimony of McCants, Deputy Hakker, and Dr. Ellis and reasonable inferences drawn from their testimony, sufficient evidence supports the jury's findings that Petitioner caused McCants great bodily injury.

Petitioner cites to *People v. Delgado*, in which the California Court of Appeal for the Third District found that a victim who suffered a serious permanent brain injury, but was not comatose, did not support the great bodily injury enhancement. 213 Cal. App. 4th 660, 667 (2013). Based on the holding in *Delgado*, Petitioner contends the hammer blows to McCants' back did not cause "an identified injury that could amount to a 'great bodily injury.'" (Doc. 1 at 37-38.)

Petitioner's argument is unavailing. In *Delgado*, the Court of Appeal held that substantial evidence did not support the great bodily injury enhancement pursuant to California Penal Code § 12022.7(b), because there was not substantial evidence that the victim was comatose due to a brain injury. 213 Cal. App. 4th at 667. The Court made this finding based on subsection (b) of 12022.7, which states: "[a]ny person who personally inflicts great bodily injury . . . in the commission of a felony or attempted felony *which causes the victim to become comatose due to brain injury* . . . shall be punished." *Id*. (emphasis in original). The Court held "[u]nder the plain language of the statute, the fact the victim suffered a brain injury is not sufficient to impose the enhancement; the victim must be rendered comatose due to the brain injury." *Id*. The case is inapplicable to the case at bar as Petitioner was charged under subsection (e), not subsection (b).

The Court of Appeal's decision was not an objectively unreasonable application of clearly established federal law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. For these reasons, the Court recommends denying Petitioner's claim that there was insufficient evidence to support a finding that Petitioner caused great bodily injury.

//

13

## IV.    Errors in Jury Instructions Do Not Present Cognizable Federal Claims

In his second ground for habeas relief, Petitioner contends the trial court erred by refusing to instruct the jury on simple assault as to the lesser included offense to felony assault in count 11. (Doc. 1 at 38.) Respondent counters that the state court's failure to instruct on a lesser included offense does not present a federal question. (Doc. 12 at 16-17.)

### A.   Federal Habeas Review of Jury Instruction Errors

Federal habeas corpus review is only available to correct violations of federal law. 28 U.S.C. §2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). The Supreme Court has held that in capital murder cases, the defendant has a constitutional right to have the jury instructed on a lesser included offense. *Beck v. Alabama*, 447 U.S. 625, 638 (1980). However, in *Beck*, the Supreme Court reserved judgment on whether the Due Process Clause also requires instruction on lesser included offenses in noncapital cases. *Id.* at 638, n. 14.

The Ninth Circuit has held the "[f]ailure of a state court to instruct on a lesser [included] offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding." *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976) (citing *Grech v. Wainwright*, 492 F.2d 747, 748 (5th Cir. 1974)). The Ninth Circuit has declined to find constitutional error arising from the failure to instruct on lesser included offenses in noncapital cases. *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984). The *Bashor* court noted, however, that a defendant's right to adequate jury instructions on his theory of the case could, in some cases, constitute an exception to this general rule. *Id.*

### B.   State Court of Appeal Opinion

At trial, the court instructed the jury on the charged offense of assault with a deadly

weapon,[7] but did not instruct on the lesser included offense of simple assault.

The Court of Appeal held the trial court did not err in refusing to instruct the jury on the lesser included offense of simple assault:

> The jury received the standard felony assault instruction on count 11 using the language of CALCRIM No. 875. Defense counsel requested and was refused a simple assault instruction on counts 10 and 11. [Petitioner] contends the trial court erred in refusing to instruct the jury on simple assault as a lesser included offense

---

[7] As read to the jury, the instruction for assault with a deadly weapon, CALCRIM No. 875, provides:

The defendant is charged in Counts 10 and 11 with assault with a deadly weapon other than a firearm in violation of Penal Code section 245.

To prove that the defendant is guilty of this crime, the People must prove that:

1. The defendant did an act with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person;

2. The defendant did that act willfully;

3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; AND

4. When the defendant acted, he had the present ability to apply force with a deadly weapon other than a firearm to the person.

Someone commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage.

The terms application of force and apply force mean to touch in a harmful or offensive manner. The slightest touching can be enough if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind.

The touching can be done indirectly by causing an object to touch the other person.

The People are not required to prove that the defendant actually touched someone.

The People are not required to prove that the defendant actually intended to use force against someone whom he acted.

No one needs to actually have been injured by defendant's act. But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault, and if so, what kind of assault it was.

A deadly weapon other than a firearm is any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.

(Lodged Doc. 1 at 275-76.)

to felony assault on count 11. [Petitioner] argues the hammer was not used in a manner to cause death or great bodily injury. We reject this contention.

[Petitioner] acknowledges an instrument not inherently dangerous can become so depending on how it is used. A pillow, for example, could be used to smother someone but is not otherwise a deadly weapon. (*People v. Page* (2004) 123 Cal.App.4th 1466, 1472-1473 [pencil deemed a deadly weapon because of its manner of use].) [Petitioner] argues the assault in count 11 did not involve injuries so extensive as to necessarily amount to the hammer's use as a deadly weapon.

A trial court is required to instruct on lesser included offenses when the evidence raises a question as to whether all the elements of the charged offense were present, but not when there is no evidence the necessarily included offense was less than that charged. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) Where evidence supporting the lesser included offense exists, the trial court has a sua sponte duty to give the instruction even without a request by the defendant. On the other hand, the trial court is not obligated to instruct on theories without evidentiary support. (*People v. Smith* (2013) 57 Cal.4th 232, 239-240.)

As used in section 245, subdivision (a)(1), a deadly weapon is any object, instrument, or weapon used in a way capable of producing, and likely to produce, death or great bodily injury. Some objects such as dirks and blackjacks have been held to be deadly as a matter of law. Other objects, though not deadly per se, may be used in a manner likely to produce death or great bodily injury. In determining whether an object that is not inherently deadly or dangerous is used in such a manner, the trier of fact may consider the nature of the object, the manner it was used, and all other facts relevant to the issue. (*People v. Aguilar* (1997)16 Cal.4th 1023, 1028-1029.)

Section 245 prohibits an assault by means of force likely to produce great bodily injury, not the use of force that does in fact produce such an injury. The crime can be committed without the infliction of any physical injury and no blow need be struck. The focus is on the force actually exerted by the defendant, not the amount of force that could have been used. Force likely to produce great bodily injury can be found where the attack is made by the use of hands or fists. (*People v. Brown* (2012) 210 Cal.App.4th 1, 7 [use of BB gun causing red welts on one victim's foot and the other victim's back.])

In *People v. McDaniel* (2008) 159 Cal.App.4th 746, two assailants repeatedly punched the victim about the head and upper body with closed fists, causing one assailant to fracture his own knuckle, and the victim to suffer other abrasions and contusions. The victim also suffered a bloody nose, scratches on his face, and lacerations on his neck requiring stitches. The defendant continued to punch the victim even after police officers intervened. *McDaniel* found there was no evidence to warrant instructions on simple assault and there was no way a jury could reasonably conclude the force applied to the victim's face and head was not likely to cause him to suffer great bodily injury. (*Id.* at p. 749.)

The instant action is factually apposite to *McDaniel* and we apply its holding here.

Other authorities have found a hammer deployed as a weapon is capable of deadly and dangerous use. (*People v. Seaton* (2001) 26 Cal.4th 598, 665; *People v. Van Every* (1993) 133 Cal.App. 354, 357.) [Petitioner's] use of a hammer as alleged in count 11 constituted assault with a deadly weapon by means likely to produce death and great bodily injury. There was nothing benign, ambiguous, or merely threatening in how [Petitioner] used the hammer on McCants's shoulder. He threatened her life by his conduct and his words, and he caused great bodily injury to her shoulder as discussed above.

There are no facts in the record to support a jury instruction on the lesser included offense of simple assault from [Petitioner's] use of a hammer. If the jury did not believe [Petitioner] used a hammer on the victim's shoulder, it would have acquitted him of count 11. There was no evidence that when [Petitioner] wielded the hammer, his conduct only amounted to simple assault. Under the standard set forth in *People v. Breverman*, *supra*, 19 Cal.4th 142, a lesser included instruction was not required where there was no evidence to support that theory. The trial court did not err in denying [Petitioner's] motion for an instruction on simple assault.

*Lopez*, (No. F068446), at 11-14.

## C. **The Court Did Not Err in Instructing the Jury**

The Supreme Court has never explicitly held a defendant has the right to a lesser included offense instruction. *Id*. (citing *Keeble v. United States*, 412 U.S. 205, 213 (1973)). However, even considering the exception in *Bashor*, that the refusal of a court to instruct a jury on a lesser included offense when that offense is consistent with the defendant's theory of the case may constitute a cognizable habeas claim, there was no constitutional error in this case. The Court of Appeal found no error in the trial court's refusal to instruct on simple assault because there was no substantial evidence to support simple assault.

At trial, defense counsel asked to instruct the jury on simple assault pursuant to CALCRIM No. 915, which holds:

To prove that the defendant is guilty of this crime, the People must prove that:

1. The defendant did an act that by its nature would directly and probably result in the application of force to a person;

2. The defendant did act willfully;

3. When the defendant acted, he was aware of facts that would lead a reasonable

17

person to realize that his act by its nature would directly and probably result in the application of force to someone; [AND]

4. When the defendant acted, he had the present ability to apply force to a person(.)

(Lodged Doc. 1 at 216.)

The court refused to give the simple assault instruction, because "the allegations contained are assault with a deadly weapon, and it does appear, based on the evidence, that the elements of those particular offenses have been supported by the record." (Lodged Doc. 4 at 702.)

If a reasonable jury could have found that Petitioner committed only a simple assault, the court should have instructed the jury as to the lesser included offense of simple assault. However, the Court of Appeal affirmed the trial court's ruling, because there were "no facts in the record to support a jury instruction on the lesser included offense of simple assault from [Petitioner's] use of a hammer." *Lopez*, (No. F068446), at 11-14. Petitioner assaulted McCants with a hammer, which caused severe injuries, as described *supra*. The hammer was "used in such a way that it [wa]s capable of causing and likely to cause death or great bodily injury."

Given that Petitioner hit McCants with the hammer, knocking the wind out of her and causing her shoulder to swell, which contributed to her blood loss, the Court cannot say that the Court of Appeal was clearly erroneous in ruling that the record did not support a simple assault charge. For these reasons, the Court recommends denying Petitioner's petition for writ of habeas corpus.

## V.    Petitioner Is Not Entitled to Relief on his Double Jeopardy Claim

In his third ground for habeas relief, Petitioner contends the trial court violated double jeopardy principles by imposing a consecutive sentence on his attempted voluntary manslaughter conviction. (Doc. 1 at 42.). Petitioner alleges the court imposed multiple punishments for a single act, beating McCants with a bat, by imposing sentences for torture, count 3, and attempted voluntary manslaughter, count 7, based on the same act. *Id*. Respondent counters federal habeas

review is not proper for errors in the application of state law.  (Doc. 12 at 20-21.)

### A.  <u>State Court of Appeal Opinion</u>

The Court of Appeal rejected this claim, holding:

> The trial court found [Petitioner] harbored a separate intent to kill McCants and committed separate acts of violence when he perpetrated attempted voluntary manslaughter.  The court sentenced [Petitioner] to an upper term sentence of five years six months for attempted voluntary manslaughter on count 7 plus a consecutive term of five years for the great bodily injury allegation alleged as to that count.

> [Petitioner] contends the trial court's sentence violated section 654[8] because the most likely act placing the victim's life in danger was hitting her in the ribs with a baseball bat, breaking ribs that punctured one of her lungs.  [Petitioner] was convicted for this conduct in count 3, one of the torture allegations.  [Petitioner] argues he was already sentenced on count 3 for causing the rib fracture and lung injury.  [Petitioner] contends section 654 should apply to both his conviction for count 7 as well as to the great bodily injury enhancement alleged on that count.  We disagree.

> Section 654 protects against multiple punishment.  The statute literally applies only where such punishment arises out of multiple statutory violations produced by the same act or omission.  Where the defendant is convicted of multiple offenses, if the additional offenses are merely incidental to or were the means of facilitating a single objective, the defendant may be found to have harbored a single intent and can be punished only once.  (*People v. Harrison* (1989) 48 Cal.3d 321, 335, cited with approval in *People v. Correa* (2012) 54 Cal.4th 331, 342-343.)  Section 654 prohibits multiple punishment[s] for a single physical act that violates different provisions of law.  (*People v. Jones* (2012) 54 Cal.4th 350, 357-360 [overruling *In re Hayes* (1969) 70 Cal.2d 604].)

> It is the defendant's intent and objective, not the temporal proximity of his or her offenses, which determines if the transaction is divisible.  (*People v. Capistrano* (2014) 59 Cal.4th 830, 886-887; *People v. Harrison*, *supra*, 48 Cal.3d at p. 335.)  What constitutes a single physical act may not always be easy to ascertain.  "In some situations, physical acts might be simultaneous yet separate for purposes of section 654."  (*People v. Jones*, *supra*, 54 Cal.4th at p. 358.)

> There must be evidence to support the trial court's finding [Petitioner] formed a separate intent and objective for each offense for which he or she was sentenced.

---

[8] California Penal Code § 645(a) provides:

> An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.  An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other.

[Petitioner's] intent and objective are factual questions for the trial court. We view the evidence in the light most favorable to the trial court's ruling. (*People v. Capistrano*, *supra*, 59 Cal.4th at pp. 885-886, 887.) A trial court's finding, express or implied, that a defendant harbored a separate intent and objective for each offense is upheld on appeal when supported by substantial evidence. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1368, limited on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn.3.)

[Petitioner] analogizes his sentences on counts 3 and 7 to *Jones* where the Supreme Court held it was error for a defendant to be punished multiple times for the possession of a single firearm. (*People v. Jones*, *supra*, 54 Cal.4th at p. 358.) [Petitioner] argues his single act of hitting McCants in the ribs with a baseball bat cannot be punished twice for torture in count 3 and attempted voluntary manslaughter in count 7, regardless of how many separate intents he harbored.

As noted, by the People, although the baseball bat blow that fractured McCants's ribs and punctured her lung may have been the most severe blow, it was not the only blow she received during [Petitioner's] final, prolonged beating. The People further argue there was no testimony from Dr. Ellis, or any other witness, that McCants's fractured ribs were the only injuries placing her in mortal danger. Dr. Ellis testified McCants had at least four or five different processes that could have caused her imminent death. We find the People have accurately analyzed the evidence adduced at trial and agree with their assessment McCants's life was imperiled by more than one single act by [Petitioner].

A night or two before the end of their relationship, [Petitioner] threatened to kill McCants. [Petitioner] asked McCants if she wanted to die on the couch or in the bathtub. McCants begged [Petitioner] not to kill her. [Petitioner] said he had to because it had gone too far and killing McCants was the only way he had out. The next thing McCants could remember was waking up a week later in the hospital. McCants had injuries on her body that were not present before she passed out.

. . .

After beating McCants the evening of July 31st, and after she lost consciousness, there is evidence [Petitioner] continued to beat her. McCants, now unconscious, was in a fragile physical state that would have been obvious to anyone. From [Petitioner's] continued beating of McCants we can reasonably infer he was executing his earlier formed intent to kill her. McCants's condition was made more precarious by [Petitioner's] delay in obtaining medical assistance for her. [Petitioner's] conduct evidenced both the intent to kill McCants and constituted additional conduct that was not separately charged by the prosecutor in the information.

The Supreme Court in *McKinzie* upheld an implicit finding the defendant harbored multiple objectives in committing burglary and either carjacking or kidnapping. There, the offenses originated from a confrontation in the victim's garage between the defendant and the victim. After kidnapping and disposing of the victim's body,

the defendant went into the victim's apartment and stole her property. Although there was a course of conduct, our high court found the defendant's conduct divisible. (*People v. McKinzie*, *supra*, 54 Cal.4th at pp. 1368-1369.) In *Capistrano*, the Supreme Court found the home invasion robbery against multiple victims soon followed by the carjackings of the victims also constituted divisible conduct subject to punishment for each offense. The Court rejected [Petitioner's] continuous course of conduct argument. (*People v. Capistrano*, *supra*, 59 Cal.4th at p. 887.)

We conclude this case is factually analogous to *McKinzie* and *Capistrano* and distinguishable from *Jones*. There was evidence to support the trial court's express finding [Petitioner's] intent to kill McCants was separate from the other charged offenses of torture, assault with a deadly weapon, mayhem, and domestic violence. The trial court did not violate section 654 in sentencing [Petitioner] to consecutive sentences for count 7 and the related great bodily injury enhancement.

*Lopez*, (No. F068446), at 14-17.

## B. Petitioner Is Not Entitled to Federal Habeas Relief based on Double Jeopardy

Typically, challenges to a state court's application of state sentencing laws do not create a federal question cognizable on federal habeas review. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). "Absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief." *Christian v. Rhode*, 41 f.3d 461, 469 (9th Cir. 1989). Petitioner must show that the claimed sentencing error was "so arbitrary or capricious as to constitute an independent due process" violation. *Richmond v. Lewis*, 506 U.S. 40, 50 (1992) (internal citation and quotation marks omitted).

Petitioner's claim is based on an alleged violation of California Penal Code § 654. The Ninth Circuit has held that a federal court may not review an alleged violation of California Penal Code § 654, because it is a matter of state law and 29 U.S.C. § 2254(a) only authorizes federal courts to grant habeas relief for violations of federal law. *Watts v. Bonneville*, 879 F.3d 685, 687 (9th Cir. 1989). The court will nonetheless consider Petitioner's argument that imposing two sentences for his actions violated the Fifth Amendment guarantee against double jeopardy.

//

The Double Jeopardy Clause protects "an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense." *Burks v. United States*, 437 U.S. 1, 11 (1978) (quoting *Green v. United States*, 355 U.S. 184, 187 (1957)). "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended. *Missouri v. Hunter*, 459 U.S. 359, 366 (1983). The Double Jeopardy Clause permits cumulative punishments for a single act when the state legislature has authorized such a result. *Id*. at 367-69.

Under California law, "multiple charges and multiple convictions can be based on a single criminal act, if the charges allege separate offenses." *People v. Coyle*, 178 Cal. App. 4th 209, 217 (2009). Here, separate charges of torture and attempted voluntary manslaughter were alleged. The Court of Appeal held that punishment under these two different statutes was permissible because each offense was supported by different acts and the finding that Petitioner's "intent to kill McCants was separate from the other charged offenses of torture, assault with a deadly weapon, mayhem, and domestic violence." *Lopez*, (No. F068446), at 17. Where "a legislature specifically authorizes cumulative punishment under two statutes . . . a court's task of statutory construction is at an end and the prosecution may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial." *Missouri*, 459 U.S. at 368-69. The state court determined that state law permitted cumulative punishment under the statutes for torture and attempted involuntary manslaughter; therefore, this Court is bound to accept the California court's construction of its statutes. *Id*. at 368.

Further, given the testimony regarding the different acts of abuse and injuries sustained by McCants, the Court cannot conclude that a reasonable jury could not have found that separate injures were inflicted. For these reasons, the Court recommends rejecting Petitioner's double jeopardy claim.

## VI.    Petitioner's Fourth Claim Is Procedurally Defaulted

In his fourth ground for habeas relief, Petitioner alleges that the consecutive terms of life with the possibility of parole he received on his torture convictions violate the Eighth Amendment. (Doc. 1 at 49.)  Respondent counters that this claim is procedurally defaulted, because the Court of Appeal rejected the claim as forfeited.  (Doc. 12 at 22.)   In his reply, Petitioner "accepts [ ] Respondent's claim that his fourth claim concerning cruel and unusual punishment is procedurally defaulted because the state court denied Petitioner's claim . . . ."  (Doc. 30 at 2.)

A federal court cannot review claims in a petition for writ of habeas corpus if a state court denied relief on the claims based on state law procedural grounds that are independent of federal law and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  "A district court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural requirements." *Park v. California*, 202 F.3d 1146, 1150 (2000).

A petitioner procedurally defaults his claim if he fails to comply with a state procedural rule or fails to raise his claim at the state level.  *Peterson v. Lampert*, 319 F.3d 1153, 1156 (9th Cir. 2003) (citing *O'Sullivan v. Boerckel*, 562 U.S. 838, 844-45 (1999)).  The procedural default doctrine applies when a state court determination of default is based in state law that is both adequate to support he judgment and independent of federal law. *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).  An adequate rule is one that is "firmly established and regularly followed." *Id.* (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)); *Bennett v. Mueller*, 322 F.3d 573, 583 (9th Cir. 2003).  An independent rule is one that is not "interwoven with federal law." *Park*, 202 F.3d 1146 at 1152 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)).

When a state prisoner has defaulted on his federal claim in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred, unless

the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

Because Petitioner agrees that his fourth claim is procedurally defaulted, and he does not demonstrate cause for the default and actual prejudice, the Court recommends denying Petitioner's claim.

## VII.    <u>Certificate of Appealability</u>

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

> (c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>        (A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

> (B)  the final order in a proceeding under section 2255.

> (2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

> (3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if

24

jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief to be debatable or wrong, or conclude that the issues presented required further adjudication. Accordingly, the Court recommends declining to issue a certificate of appealability.

**VIII.  Conclusion and Recommendation**

Based on the foregoing, the undersigned recommends that the Court deny the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **July 3, 2018**                    /s/ *Sheila K. Oberto*
                                    UNITED STATES MAGISTRATE JUDGE